UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| AMY L. M., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:17-cv-00113-TWP-DML |
| | ) |
| NANCY A. BERRYHILL, Deputy Commissioner | ) |
| for Operations Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Amy L. M. ("Claimant") requests judicial review of the final decision of the Deputy Commissioner for Operations of the Social Security Administration (the "Deputy Commissioner"), denying her applications for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), and Supplemental Security Income ("SSI") under Title XVI of the Act.[1] For the following reasons, the Court **REMANDS** the decision of the Deputy Commissioner for further consideration.

### I. BACKGROUND

**A. Procedural History**

On November 25, 2013, Claimant filed applications for DIB and SSI, alleging a disability onset date of July 25, 2009, due to degenerative disc disease, bulging discs, sciatica, and anxiety. Her applications were initially denied on March 18, 2014, and again on reconsideration on May 8, 2014. Claimant filed a written request for a hearing on May 20, 2014. On October 1, 2015, a

---

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits or Supplemental Security Income. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted decisions.

hearing was held before Administrative Law Judge Dennis L. Pickett (the "ALJ"). Claimant was present and represented by counsel, Patrick Hudspeth. Ray O. Burger, a vocational expert, also appeared and testified at the hearing. On March 23, 2016, the ALJ denied Claimant's applications for DIB and SSI. Following this decision, Claimant requested review by the Appeals Council. On April 25, 2017, the Appeals Council denied Claimant's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Deputy Commissioner for purposes of judicial review. On June 27, 2017, Claimant filed the instant motion for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

B. **Factual Background**

At the time of her alleged disability onset date, Claimant was thirty-three years old. Claimant received a formal education through the eighth grade and has an employment history of working as a construction worker, retail store manager, certified nursing assistant, and home health aide.

In January 2007, Claimant had an MRI taken of her lumbar spine. The MRI revealed a slight interval decrease in size of a mass on the left S1 sacral foramen compared to an earlier test conducted in March 2002. No new masses were visualized, and no significant changes had occurred in small protrusions at L4-5 and L5-S1 ([Filing No. 14-12 at 11](Filing No. 14-12 at 11)).

Two years later, in February 2009, Claimant had an MRI taken of her cervical spine because of neck pain and headaches ([Filing No. 14-8 at 5](Filing No. 14-8 at 5)). The MRI revealed evidence of a muscle spasm, borderline spinal stenosis at C4-5, and mild spinal stenosis at C6-7. *Id.* Claimant also presented to her physician in February 2009 complaining of migraine headaches but noting that medication was helpful. *Id.* at 4. In May 2009, Claimant again went to her physician complaining

2

that she was experiencing panic attacks and one to two migraine headaches a week. She was directed to continue taking her Imitrex and was prescribed other medications. *Id.* at 3.

Because of severe headaches and neck pain, in July 2010, Claimant had a CT scan taken of her head. Her brain was intact and normal, and there were signs of minimal chronic sinus disease ([Filing No. 14-11 at 6](#)). Also in July 2010, Claimant had MRIs taken of her cervical spine and lumbar spine ([Filing No. 14-9 at 21](#)–23). The MRIs revealed mild diffuse bulging at C4-5, C5-6, and C6-7 without spinal stenosis in the cervical spine. *Id.* at 21.

In November 2010, Claimant began receiving pain management treatment from Tristan V. Stronger, M.D. ("Dr. Stronger") at Pain Management Center of Indiana ([Filing No. 14-12 at 24](#)). Claimant complained of pain in her neck, back, knee, hip, and right foot. She also noted her migraine headaches. Dr. Stronger observed muscle spasms in Claimant's back and a decreased range of motion. Claimant reported that her medications made her pain tolerable. She was diagnosed with degenerative disc disease, radiculitis, and spondylosis. Dr. Stronger saw Claimant three more times through the end of 2010. Claimant continued to receive pain management treatment from Dr. Stronger on a consistent basis from August 2011 through October 2012. She complained of ongoing headaches, and neck and back pain. Dr. Stronger continued to prescribe pain medications to Claimant. *Id.* at 12–31.

On October 2, 2011, Claimant presented to the emergency room complaining of a migraine. She described the pain as throbbing and constant, and it was exacerbated by position change and light. The attending physician noted Claimant appeared to be in moderate distress secondary to her pain. The physician administered Tylenol and Imitrex and discharged Claimant to go home with directions to go the bed ([Filing No. 14-9 at 34](#)–41).

Claimant reported to the emergency room on September 18, 2012, complaining of a migraine headache. She had taken Imitrex without relief. She was experiencing photophobia, nausea, and vomiting. The attending physician administered medication intravenously, and once Claimant was stable and feeling better, she was discharged to go home and instructed to go to bed ([Filing No. 14-9 at 55](#)–64).

On April 27, 2013, Claimant again presented to the emergency room because she was experiencing a migraine and vomiting for two days. Her migraine was aggravated by bright lights and position change. The attending physician administered medication intravenously and provided a prescription for Imitrex. Claimant was discharged with directions to continue her current medications. *Id.* at 66–75. She again returned to the emergency room on June 23, 2013, having experienced a migraine for the previous thirty hours. She also was experiencing photophobia, dizziness, nausea, and blurred vision. The attending physician administered medication intravenously, and once Claimant felt better, she was discharged to go home. *Id.* at 77–83.

Claimant presented to the hospital emergency room on October 15, 2013, because she had been experiencing a migraine for two days. The migraine was aggravated by bright lights. She reported experiencing photophobia, nausea, vomiting, fever, and neck pain/stiffness. She was administered medications intravenously and was eventually discharged to go home to bed. Claimant was instructed to return if her condition worsened ([Filing No. 14-10 at 4](#)–10). Claimant returned to the emergency room the next evening, stating she still had a migraine with photophobia. She stated her headache had initially improved but then had returned and increased in severity. The attending physician administered medications intravenously and then discharged Claimant when she felt better ([Filing No. 14-11 at 42](#)–46).

Claimant continued to present to the hospital emergency room seeking treatment for migraines with photophobia, nausea, and vomiting on October 11, 2014, March 1, 2015, August 23, 2015, January 29, 2016, and May 14, 2016. When she presented to the emergency room, she was administered medications, usually intravenously, and then discharged to go home, usually with instructions to rest and a prescription for medication ([Filing No. 14-11 at 13](Filing No. 14-11 at 13)–24; [Filing No. 14-12 at 5](Filing No. 14-12 at 5)–7; [Filing No. 14-14 at 45](Filing No. 14-14 at 45)–51). Claimant also visited the emergency room for other complaints such as abdominal pain, back pain, leg pain, and chest tightness ([Filing No. 14-11 at 25](Filing No. 14-11 at 25), 29, 37, 65; [Filing No. 14-14 at 34](Filing No. 14-14 at 34)).

After she applied for DIB and SSI, Claimant underwent a psychological evaluation on February 13, 2014, conducted by Deborah A. Zera, Psy.D ("Dr. Zera"). Claimant reported that her self-care had declined, she was unable to stay organized or perform housework, and she often lost track of what she was doing. She also reported a low energy level and a varied mood. She stated that sometimes she would get depressed and lay in bed for weeks at a time. She also reported experiencing panic attacks and anxiety. On mental examination, Dr. Zera noted Claimant's anxiety. Dr. Zera diagnosed her with major depressive disorder and post-traumatic stress disorder ("PTSD") ([Filing No. 14-10 at 12](Filing No. 14-10 at 12)–14).

As part of the DIB and SSI application process, Claimant visited Jason Fish, M.D. ("Dr. Fish") for a physical evaluation on March 11, 2014. Dr. Fish noted "issues" of degenerative disc disease, bulging discs, sciatica, and anxiety. Following the physical evaluation, Dr. Fish noted Claimant's spinal curvature, crepitus in both knees during extension, decreased reflexes in arms and legs, unsteady tandem walk, painful heel and toe walk, and limited depth with squat. Dr. Fish also noted a decreased range of motion in Claimant's left cervical rotation and lumbar forward

flexion. Dr. Fish opined that Claimant had the ability to stand and walk for at least 6 hours in an 8-hour workday and to carry at least 20 to 30 pounds (Filing No. 14-10 at 16–19).

During the administrative hearing before the ALJ, Claimant testified that the frequency of her migraines varied, but sometimes she had as many as three per week, and they lasted at least twenty-four hours and sometimes lasted three days. Claimant did not know what triggered her migraines, but sometimes they were strong enough to affect her vision and hearing and made her nauseous. At the onset of a migraine, Claimant typically would lie down in a cool, dark room, take Imitrex, and use a cold, wet cloth to minimize the pain. Claimant reported that she often went to the emergency room if she could not get rid of the migraine at home (Filing No. 14-2 at 53–55). Claimant also testified about the back and neck pain that she experienced. *Id.* at 56–62.

## II. DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after he establishes that he is disabled. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, he is not

disabled. 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps. Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant can perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In

7

reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold the ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. THE ALJ'S DECISION

The ALJ first determined that Claimant met the insured status requirement of the Act through September 30, 2017. The ALJ then began the five-step sequential evaluation process. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since July 25, 2009, the alleged onset date of Claimant's disability. At step two, the ALJ found that Claimant had the following severe impairments: migraine headaches, obesity, bulging discs at the cervical spine, and degenerative disc disease at the lumbar spine. The ALJ found Claimant's major depressive disorder, PTSD, and history of spousal physical violence to be non-severe impairments.

At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

In determining Claimant's RFC, the ALJ explained,

> I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant cannot climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; only occasional exposure to hazardous conditions such as heights or dangerous machinery. She can work in a noise level of "3" or less as defined by the Dictionary of Occupational Titles. She also cannot perform work around bright pulsating lights, and can have only occasional exposure to fumes, dusts, odors, gases and poor ventilation.

([Filing No. 14-2 at 31](Filing No. 14-2 at 31).)

At step four, the ALJ determined that Claimant was unable to perform her past relevant work as a construction worker, retail clerk, or certified nursing assistant because the demands of this past work exceeded her RFC. At step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Claimant could perform such as a mail clerk, general office helper, or stocker. Having determined that Claimant could perform work in other jobs in the economy, the ALJ determined that Claimant was not disabled. Therefore, the ALJ denied Claimant's applications for DIB and SSI because she was found to be not disabled.

## IV. DISCUSSION

In her request for judicial review, Claimant argues that the ALJ erred by conducting an insufficient, perfunctory evaluation regarding whether Claimant's migraines medically equaled Listing 11.03. Claimant further argues that the ALJ erred by failing to account for all of her impairments when determining her RFC and informing the vocational expert of the impairments at Step 5 of the sequential evaluation process. Finally, Claimant asserts that the Appeals Council

failed to evaluate new and material evidence, thereby necessitating remand for further consideration.

A. **Step 3 Analysis of Migraines**

Claimant asserts that the ALJ noted whether her recurring migraine headaches were medically equivalent to the Listing for epilepsy because of the nonexistence of a Listing for recurring migraine headaches and because the epilepsy Listing is the most analogous Listing for considering medical equivalence of migraines. However, Claimant argues, the ALJ gave only a conclusory statement that Claimant's impairments did not "meet"—rather than "medically equal"—the exact epilepsy-related criteria of the Listing.

The ALJ wrote that Claimant's chronic migraines did not meet or medically equal Listing 11.03 because "the record fail[ed] to demonstrate evidence of epilepsy or epileptic seizures." ([Filing No. 14-2 at 31](#).) Claimant asserts that this explanation might explain why her migraine headaches did not "meet" the specific criteria for Listing 11.03, but it did nothing to explain why they did not "medically equal" the Listing. Claimant argues that the ALJ's conclusory statement did not analogize her recurring headaches to the epilepsy Listing let alone provide any substantive explanation why a recurring need to go to the hospital for treatment for debilitating migraines was not equal to the Listing's intent. Claimant asserts that she did not allege epilepsy or seizures, therefore, she could never "meet" the specific Listing criteria because she does not have seizures. She argues she did not have to experience seizures for her migraines to cause the same debilitating symptoms to medically equal the intent of Listing 11.03. She argues the ALJ's written decision concerning Listing 11.03 provides no explanation and does not actually consider medical equivalence as required.

Additionally, Claimant argues the ALJ committed reversible error in failing to rely on a medical opinion in determining her migraines did not medically equal Listing 11.03. She asserts that no doctor ever opined whether her recurring migraines could medically equal the intent of Listing 11.03, and the state agency consulting physicians did not consider whether her condition met or medically equaled Listing 11.03. "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (citing 20 C.F.R. § 404.1526(b) ("Medical equivalence must be based on medical findings. . . . We will also consider the medical opinion given by one or more medical or psychological consultants designated by the Commissioner in deciding medical equivalence.")).

In response, the Deputy Commissioner notes that to establish presumptive disability under a Listing at Step 3, a claimant must satisfy each of the specified medical criteria of the Listing; an impairment that manifests only some of the criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The Deputy Commissioner argues that Claimant failed to show her headaches equaled Listing 11.03, and thus, the ALJ's decision should stand.

The Social Security Administration's program operations manual provides an example of a severe migraine that could medically equal Listing 11.03, but Claimant did not present evidence of such severe migraines. Additionally, state agency consulting physicians, M. Brill and Mangala Hasanadka, reviewed Claimant's medical records that included treatment for migraines, and neither physician opined that Claimant's migraines satisfied any Listing ([Filing No. 14-3 at 10](Filing No. 14-3 at 10)–11, 33); the Deputy Commissioner asserts that this evidence supports the ALJ's determination. Furthermore, the ALJ discussed throughout other sections of the written opinion the evidence of Claimant's migraines, explaining the lack of severity to support a Listing level equivalency. The

11

Deputy Commissioner argues that, even if the ALJ erred in not adequately considering Listing 11.03, any such error would be harmless because Claimant did not show any debilitating severity of her migraines. Instead, the evidence showed Claimant retained consciousness and awareness even during a migraine headache.

The Seventh Circuit has directed that, "[i]n considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

In his decision, the ALJ wrote,

> The claimant's migraine headaches fail to meet or medically equal Listing 11.00 of Appendix 1 impairments. The medical record fails to establish evidence of any neurological deficits. Specifically, the record fails to demonstrate evidence of epilepsy or epileptic seizures (11.02 and 11.03), a central nervous system vascular accident (11.04), . . . or syringomyelia (11.19). Accordingly, I find that the claimant's migraine headaches fail to meet or medically equal listing level severity.

([Filing No. 14-2 at 31](#).)

This evaluation and explanation concerning Listing 11.03 is equivalent to stating, "Claimant's migraine headaches are not epilepsy or epileptic seizures, and thus, I conclude that Claimant's migraine headaches do not meet or medically equal the Listing for epilepsy or epileptic seizures." There is no analysis or comparison of factors, signs, symptoms, conditions, criteria, or severity. Such a conclusory statement might perfunctorily support a decision that migraine headaches are not epilepsy (*i.e.*, do not meet the Listing); however, such a statement cannot support a decision that migraine headaches do not medically equal the Listing. There should be at least some minimal comparison and explanation regarding equivalency. Yet in this case, the ALJ did not provide any comparison and explanation in his decision. He simply concluded that the migraine headaches did not meet or medically equal the Listing.

While the Social Security Administration's program operations manual provides an example of severe migraines that could medically equal Listing 11.03, it does not create a new and exclusive set of criteria to show an impairment medically equals one of the Listed Impairments. Furthermore, the ALJ did not discuss any examples from the program operations manual to support his decision; thus, this argument from the Deputy Commissioner cannot rectify the ALJ's deficient decision.

The Deputy Commissioner's *post hoc* arguments that the ALJ's decision was supported by substantial evidence and that the Step 3 conclusion was supported by discussion of migraine headaches in other sections of the written decision are unavailing. The brief discussion about Claimant's emergency room visits and treatment for migraine headaches in other sections of the ALJ's written decision did not provide any analysis to compare the migraines to any Listed Impairment in order to support the Step 3 determination. Because the ALJ failed to provide any explanation regarding medical equivalency of the migraine headaches, remand is appropriate to allow the ALJ to fully consider and explain the Step 3 analysis of Claimant's severe impairment of migraine headaches.

In light of the Court's determination that remand is appropriate, the Court only briefly notes that state agency consulting physicians, Dr. Brill and Dr. Hasanadka, reviewed Claimant's medical records in the context of RFC rather than Listed Impairments. While Dr. Brill and Dr. Hasanadka acknowledged the medical records included information about Claimant's migraine headaches, they both asserted that Claimant "does not allege migraine." ([Filing No. 14-3 at 11](Filing No. 14-3 at 11), 33.) As a result, the consulting physicians did not provide an analysis of migraines in the context of Listed Impairments. Therefore, the fact that Dr. Brill and Dr. Hasanadka mentioned the migraine

headaches in their RFC assessment of their record review is not entirely helpful to the Deputy Commissioner's Step 3 argument on judicial review.

As the Court has noted above, remand is appropriate to allow the ALJ to consider and explain a determination of whether Claimant's severe impairment of migraine headaches medically equals Listing 11.03.

**B.**     **Accounting for All Impairments in the RFC and at Step 5**

Claimant next asserts that the ALJ acknowledged that her migraine headaches required her to seek treatment in the emergency room and to take long periods of time laying down in a dark room yet failed to account for any time off task when determining the RFC and when presenting hypothetical questions to the vocational expert. Claimant argues the ALJ failed to provide a logical bridge between his acknowledgment of a need for time off task and his conclusion of an RFC without an accommodation for time off task. She also argues that the ALJ failed to account for her mental health impairments that affected her concentration and social functioning.

In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all an individual's impairments, even those that are not 'severe.' SSR 96-8p. In order for vocational expert testimony to provide substantial evidence that a claimant can perform other jobs, an ALJ is required to orient the vocational expert to the totality of the claimant's limitations. *O'Conner-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Claimant argues that the state agency medical consultants and the ALJ himself concluded that Claimant had mild limitations in daily activities, maintaining concentration, persistence, and pace, and maintaining social functioning, with non-severe impairments of PTSD and depression, yet the ALJ failed to account for these non-severe impairments and limitations in the RFC assessment. Additionally, Claimant asserts the ALJ failed to inform the vocational expert of these non-severe limitations and impairments, thereby

undermining the vocational expert's ability to provide informed testimony that could serve as substantial evidence at Step 5.

Although the ALJ discussed Claimant's migraine headaches and their effects, the ALJ wholly failed to account for Claimant's non-severe impairments of PTSD and depression and the resulting limitations in determining an appropriate RFC. There is no discussion of PTSD or depression in the ALJ's decision regarding the RFC or available work at Steps 4 and 5. During the administrative hearing, there was no discussion or testimony regarding non-severe impairments of PTSD and depression. As a result, the vocational expert was not oriented to those impairments and could not provide fully informed expert testimony about available work for an individual with all of Claimant's impairments.

When determining a claimant's RFC, an ALJ must consider the combined effect of all impairments, "even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing 20 C.F.R. § 404.1523). An ALJ's "failure to fully consider the impact of non-severe impairments requires reversal." *Denton v. Astrue,* 596 F.3d 419, 423 (7th Cir. 2010). The ALJ failed in this case to account for Claimant's non-severe impairments of PTSD and depression and the resulting limitations in the RFC, as well as at the Step 5 determination. Therefore, the Court concludes that remand is appropriate for this additional reason.

Because the Court already has determined that remand is appropriate based on the first two arguments and that the ALJ committed error, the Court declines to address Claimant's third argument for remand, which addresses an issue that arose at the Appeals Council level of the administrative proceedings.

15

## V. CONCLUSION

For the reasons set forth above, the final decision of the Deputy Commissioner is **REMANDED** for further proceedings consistent with this Entry as authorized by Sentence Four of 42 U.S.C. § 405(g).

**SO ORDERED.**

Date: 11/29/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Matthew Frederick Richter
KELLER & KELLER
mrichter@2keller.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov

Christie O'Brien Tate
SOCIAL SECURITY ADMINISTRATION
christie.tate@ssa.gov